Michael Yancey, NV #16158
Consumer Attorneys
2300 West Sahara Ave. Suite 800
Las Vegas, NV 89102
8245 N. 85th Way
Scottsdale, AZ 85258
E: myancey@consumerattorneys.com
T: (480) 573-9272
F: (718) 715-1750

*Attorney for Plaintiff*
*Shawn Swilley*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| SHAWN SWILLEY,<br><br>Plaintiff,<br><br>v.<br><br>RENTGROW, INC., CLEARA, LLC<br><br>Defendant. | Case No.: 2:23-cv-00860-ART-EJY<br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Shawn Swilley ("Plaintiff") by and through his counsel brings the following Amended Complaint against Defendants RentGrow, Inc. ("RentGrow") and Cleara, LLC ("Cleara," collectively RentGrow, the "Defendants") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of a tenant

1

screening report that RentGrow published to Plaintiff's prospective landlord which inaccurately reported Plaintiff's expunged criminal records.

## INTRODUCTION

1. This is an individual action for damages, costs, and attorney's fees brought against the Defendants pursuant to the FCRA.

2. The Defendants are consumer reporting agencies ("CRA") that compile and maintain files on consumers on a nationwide basis. Each sells consumer reports, also known as tenant screening reports, generated from there databases and furnishes these tenant screening reports to mortgage brokers, landlords, and property management companies who use the reports to make decisions regarding prospective borrowers and tenants.

3. RentGrow assembled and published an inaccurate tenant screening report to Plaintiff's prospective landlord which included a felony conviction.

4. However, Plaintiff had this record expunged in 2015.

5. Plaintiff's prospective landlord denied Plaintiff's housing application after receiving the tenant screening report from RentGrow, in which RentGrow inaccurately published the felony conviction.

6. During the course of discovery, Plaintiff learned that RentGrow obtained this inaccurate information from Cleara in accordance with its standard practices.

7. The Defendants' inaccurate reporting could have easily been avoided had either of the Defendants performed a cursory review of the widely available underlying public court records from Atlantic County, New Jersey regarding the felony conviction prior to RentGrow publishing the information to Plaintiff's prospective landlord.

8. Had RentGrow performed even a cursory review of the underlying public court records, it would have discovered that Plaintiff had his criminal record expunged in 2015.

9. The Defendants do not employ reasonable procedures to assure the maximum possible accuracy of the information each reports concerning consumers. The Defendants' failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

10. The Defendants committed these violations pursuant to their standard policies and practices, which harm innocent consumers seeking housing by prejudicing their prospective landlords with inaccurate information.

11. The Defendants' inaccurate reporting cost Plaintiff the ability to rent a rental unit that was suitably accommodating of his needs, causing him physical injury as a result of emotional distress, embarrassment, inconvenience, anxiety, fear of homelessness, and financial loss.

12. As a result of the Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

13. As a result of the Defendants' conduct, misconduct, action, and inaction, Plaintiff brings claims against the Defendants for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

**PARTIES**

14. Plaintiff is a natural person residing in Las Vegas, Nevada, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. RentGrow is a California corporation doing business throughout the United States, including the State of Nevada and in this District. RentGrow has a principal place of business located at 84 State Street, Boston, MA, 02109 and can be served through their registered agent Corporation Service Company.

16. Cleara is a Pennsylvania Corporation doing business throughout United States, including the State of Texas and in this District, and has a principal place of business located at 1049 Woodland Way, Hagerstown, MD 21742.

17. Among other things, the Defendants sell consumer reports, often called tenant screening reports, to mortgage brokers, property management companies, and landlords for their use in deciding whether to rent or otherwise offer housing to a prospective tenant. These reports are provided in connection with a business transaction initiated by the consumer.

18. The Defendants are both consumer reporting agencies as defined in 15 U.S.C. § 1681a(f) because for monetary fees, each regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for tenant screening purposes to third parties, and use interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

**JURISDICTION AND VENUE**

19. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

# STATUTORY BACKGROUND

21. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

22. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

23. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

24. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

# THE FCRA'S PROTECTIONS FOR HOUSING APPLICANTS

25. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates tenant screening reports like the one Defendant prepared in Plaintiff's name.

26. The FCRA provides a number of protections for housing applicants who are the subject of tenant screening reports for the purpose of securing housing and credit.

27. In the parlance of the FCRA, tenant screening reports are "consumer reports," and providers of tenant screening reports, like RentGrow, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

28. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

29. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

30. The Defendants disregarded their duties under the FCRA with respect to Plaintiff's tenant screening report.

**THE DEFENDANTS' ILLEGAL BUSINESS PRACTICES**

31. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal record data. As a result of the increasing availability of this data, there has been a boom in the tenant screening industry.

32. Tenant screening reports are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating tenant screening reports.

33. Tenant screening companies, like RentGrow and Cleara, collect millions of records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

34. Given that the Defendants are in the business of selling tenant screening reports, the Defendants should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

35. The Defendants place their business interests above the rights of consumers and reports such inaccurate information because it is cheaper for the Defendants to produce reports containing information that is inaccurate and incomplete than it is for the Defendants to exert proper quality control over the reports prior to their being provided to each of their customers.

36. The Defendants report such erroneous and incomplete information because they want to maximize the automation of their report creation process,

thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

37. The Defendants charge their customers the same price for reports that are grossly inaccurate as it does for accurate reports.

38. An appropriate quality control review of Plaintiff's report would have made clear that the Defendants were reporting an expunged record.

39. As a provider of tenant screening reports, the Defendants should be aware of the FCRA requirements and are likely a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

**FACTUAL ALLEGATIONS**

**Plaintiff Applies for an Apartment with The 95 Apartments**

40. In or around February 2022, Plaintiff was offered a lucrative job as a licensed nursing home administrator in Las Vegas, Nevada. Immediately, Plaintiff began searching online for a new apartment as he planned to move from Louisiana to Nevada for this opportunity.

41. On or about February 17, 2022, Plaintiff applied online to The 95 Apartments ("95 Apartments"), paid an application fee, and paid a security deposit.

In accordance with Plaintiff's desires, the 95 Apartments home was affordable, comfortable, safe, and in a highly desirable location.

## RentGrow Published an Inaccurate Tenant Screening Report to The 95 Apartments

42. 95 Apartments contracts with RentGrow to conduct tenant screening reports on prospective tenants to determine whether the prospective tenant is eligible to rent an apartment.

43. On or about February 17, 2022, 95 Apartments ordered a tenant screening report concerning Plaintiff from RentGrow (the "RentGrow Report").

44. On or about February 17, 2022, RentGrow sold the RentGrow Report to 95 Apartments, wherein RentGrow published information including a compilation of Plaintiff's credit history, criminal history, and civil records history.

45. The RentGrow Report, identified as a "Screening Report" by RentGrow, is a consumer report regulated by the FCRA.

46. Within the RentGrow Report, RentGrow published inaccurate information concerning Plaintiff.

47. Specifically, the RentGrow Report included a felony conviction from Atlantic County, New Jersey that had been expunged.

48. The criminal record information reported by RentGrow concerning Plaintiff is inaccurate.

49. Specifically, on May 29, 2015, Plaintiff had his record expunged pursuant to N.J.S.A. 2C:52-2(A)(2) *et. seq.*

50. A cursory review of the widely available underlying public court records reveals no record associated with the case number in question, as Plaintiff had the record in question expunged. In short, RentGrow did not obtain information about the criminal record in question from the public record, as no such record exists in the public record. Rather, it is clear that RentGrow obtained such information from some third-party relying on outdated information.

51. In fact, during the course of discovery, Plaintiff learned that RentGrow obtained the inaccurate criminal record information concerning Plaintiff from Cleara.

52. Cleara's provision of information, including the criminal records at issue in this case, were based on Cleara's own database and records and its public records searches.

53. Cleara represents on its website that its "modern approach" "combines billions of records searched without own proprietary data, innovative processes utilizing machine learning and artificial intelligence."

54. Further, Cleara proclaims on its website that it relates to the provision of criminal records, it maintains the most powerful "multi-state, multi-jurisdictional,

multi-county search in the industry consisting of over 1,000 unique sources and 650 records."

55. Yet, despite Cleara's online representations, Cleara reported Plaintiff's felony criminal record despite the record having been expunged years prior.

56. The sole reason the inaccurate criminal information was reported by RentGrow was that RentGrow failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the tenant screening report it sold about Plaintiff to Plaintiff's prospective landlord.

57. The sole reason that Cleara provided the inaccurate and misleading information about Plaintiff to RentGrow was that Cleara failed to follow reasonable procedures to assure the maximum possible accuracy of the information it provided to RentGrow.

58. Had either of the Defendants followed reasonable procedures, either would have discovered that Plaintiff's record had been expunged.

59. In preparing and selling a consumer report about Plaintiff, wherein RentGrow published to Plaintiff's prospective landlord inaccurate information concerning Plaintiff, RentGrow failed to follow reasonable procedures to assure maximum possible accuracy of the information RentGrow reported concerning Plaintiff, in violation of 15 U.S.C. § 1681e(b).

60. In preparing and selling a consumer report about Plaintiff, wherein Cleara published to RentGrow inaccurate information concerning Plaintiff, Cleara failed to follow reasonable procedures to assure maximum possible accuracy of the information RentGrow reported concerning Plaintiff, in violation of 15 U.S.C. § 1681e(b).

### 95 Apartments Denies Plaintiff's Housing Application

61. In or around February 2022 – after Plaintiff had traveled across the country to start his new job – he received a phone call from 95 Apartments, during which he was informed that his application had been denied for an undisclosed reason.

62. Plaintiff was extremely confused as to why he had been denied. He was aware that his credit score was very high, and the only criminal record he had ever been subject to had been expunged years prior.

63. Plaintiff panicked, as he had already moved to Nevada and was beginning his new job shortly.

64. Having been homeless at one point in the past, Plaintiff was keenly aware of how quickly things could fall apart with his housing and was extremely worried about the possibility that he might become homeless.

65. Additionally, Plaintiff's hotel was nearly $200 per night. At the time, Plaintiff had very little money and it was extremely difficult to pay for the hotel.

While he was told that the application fee and security deposit to 95 Apartments would be reimbursed eventually, he would not receive those returned funds for nearly a month.

66. Therefore, Plaintiff sustained severe emotional distress in the days following his denial from 95 Apartments concerning whether he may or may not imminently become homeless.

67. Plaintiff frantically searched to locate a new home that would suit some of his needs, and after days of searching was able to identify one such home.

68. While the replacement home was in a far less desirable area of town – and cost approximately $100 more per month – Plaintiff completed a new application nonetheless as he was quickly running out of time.

69. Plaintiff's application was approved without issue, but the new home required a substantial deposit of nearly $3,000, which further strained Plaintiff's tight finances causing him additional undue stress and anxiety.

70. Shortly thereafter, following the circumstances of the inexplicable housing denial from 95 Apartments, Plaintiff signed up for an identity monitoring service.

71. In or around April 2023, Plaintiff got an alert that stated Plaintiff had a criminal record associated with his identity.

72. Plaintiff was shocked and upset, as his only criminal record had been expunged in 2015. Accordingly, information concerning this criminal record should not have been associated with Plaintiff in any way.

73. After seeing the alert concerning Plaintiff's criminal record, Plaintiff had a realization that his housing denial could be related to his criminal record.

74. Accordingly, on or about April 28, 2023, Plaintiff contacted RentGrow to request a copy of the RentGrow Report via email.

75. Upon review, Plaintiff's heart sank. The RentGrow Report unequivocally confirmed that the reason for Plaintiff's rejection from 95 Apartments was indeed Plaintiff's expunged criminal record. Plaintiff was shocked and humiliated to see his since expunged conviction contained within the RentGrow Report.

76. Plaintiff was very panicked, confused, and concerned about the impact of the inaccurate reporting that he was associated with this record, and had concerns about whether RentGrow had reported this information to any other third parties.

**Impact of Misinformation in the Defendants' Consumer Reporting**

77. As a direct result of RentGrow's inaccurate reporting of Plaintiff's criminal record – provided to it by Cleara – 95 Apartments denied Plaintiff's rental application.

78. The Defendants' false reporting cost Plaintiff a housing opportunity that met his exact needs, including those attendant to affordability, safety, and other intangible qualities.

79. In comparison to the 95 Apartments, the apartment that Plaintiff ended up living in is approximately $100 more expensive per month and is in a far less desirable area.

80. Plaintiff works in a highly regulated area. If Plaintiff's expunged criminal history were made public, his license could be taken away which would destroy Plaintiff's ability to earn income in his very lucrative field.

81. In Plaintiff's own words, he was "shook" by the knowledge that RentGrow might publish Plaintiff's expunged criminal history and cause his career to abruptly and unceremoniously end.

82. Plaintiff has sustained a substantial amount of anxiety, stress, and generalized fear over concerns about RentGrow's harmful and inaccurate reporting.

83. Moreover, Plaintiff expended a substantial amount of effort in putting his criminal record behind him and going through the expungement process. RentGrow's reporting dredged up an awful memory from Plaintiff's past and effectively punished him a second time for an unfortunate incident that he had already paid for.

84. The injuries suffered by Plaintiff as a direct result of the Defendants' erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, the Defendants' conduct would have given rise to causes of action based on defamation and invasion of privacy.

85. As a result of the Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

86. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

87. The Defendants are both "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f).

88. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

89. At all times pertinent hereto, the above-mentioned tenant screening reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

90. The Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the tenant screening report it sold about Plaintiff as well as the information it published within the same.

91. As a result of the Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

92. The Defendants each willfully violated 15 U.S.C. § 1681e(b) in that their conduct, actions, and inactions were willful, rendering each liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, each was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

93. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from each of the Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for the following relief:

i. Determining that the Defendants negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 16th day of October 2023,

*/s/Michael Yancey*
Michael Yancey, NV #16158
Consumer Attorneys
2300 West Sahara Ave. Suite 800
Las Vegas, NV 89102
8245 N. 85th Way
Scottsdale, AZ 85258
E: myancey@consumerattorneys.com
T: (480) 573-9272
F: (718) 715-1750

*Attorney for Plaintiff*
*Shawn Swilley*